589 A.2d 1318

**In re MONTRAIL M., Harold S., Jr. and Matio C.**

**No. 1147, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 15, 1991.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellants.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and J. Frederick Price, Former State's Atty. for Kent County, Chestertown, on the brief), for appellee.

Submitted before MOYLAN, BISHOP and ROBERT M. BELL, JJ.

BISHOP, Judge.

This appeal involves two adjudicatory hearings in the Circuit Court for Kent County, sitting as the juvenile court. Each was based upon a separate incident. In the hearing on the first incident, appellant Montrail M. was found to have committed the delinquent act of driving without a license. In the hearing on the second incident, appellants Montrail M., Harold S., Jr., and Matio C., as well as another juvenile who is not a party to this appeal, were each found to have committed a delinquent act by reason of possession

of cocaine and possession with intent to distribute.[1] At subsequent disposition hearings, Montrail M. and Harold S., Jr. were committed to the custody of the Department of Juvenile Services for placement in the Hickey School. Matio C. was committed to the custody of the Department of Juvenile Services for placement in Hurlock Home. The appellants bring this consolidated appeal.

## ISSUES

### A.

Montrail M. contends that the juvenile court erred in the first adjudicatory hearing when it failed to ensure that he understood his "right to a contested proceeding" before it accepted his admission that he drove without a license.

### B.

■ All three appellants contend that in the second adjudicatory hearing:

I. The juvenile court erred in failing to merge their "convictions" for possession of cocaine into their "convictions" for possession with intent to distribute,

II. The juvenile court erred in denying their motions to suppress, and

III. The juvenile court erred in admitting their out-of-court statements into evidence.

An underlying question in all of these issues is: when should a juvenile, against whom a delinquency petition has been filed, be treated like a criminal defendant? As we shall see, prior to a delinquency adjudication an accused juvenile is entitled to many, if not all, of the constitutional protections that are accorded a criminal defendant. *See generally In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). A delinquency adjudication is not a

---

**1.** Related charges against a fifth juvenile were informally adjusted.

criminal conviction, however, and a juvenile who has been adjudicated delinquent should not be considered or treated as a criminal. *See In re Appeal Misc. No. 32*, 29 Md.App. 701, 703, 351 A.2d 164 (1976).

We find merit in Montrail M.'s argument as to the first adjudicatory hearing. We find no merit, however, in any of the arguments regarding the second adjudicatory hearing.

## A.

### *Driving Without a License*
### FACTS

At the start of the first adjudicatory hearing, defense counsel stated that Montrail M. "admits to driving the car without a license, Your Honor." The State's attorney then recited a statement of facts, to which defense counsel acquiesced. The statement indicated that a police officer, who knew Montrail M., caught the youngster driving through Chestertown in a borrowed car. At the time, Montrail M. was two months shy of his fifteenth birthday.

After listening to the statement of facts, the court concluded: "Since there is an admission then, the court has no problem at all with finding that Mr. [M.] is, has violated the laws and has performed the acts as stated and as admitted, confessed." Montrail M. argues in the appellants' brief that he "was never informed that he had a right to a contested hearing, to call witnesses, to put the State to its proof, or to any related right of a criminal defendant...."

### DISCUSSION

"[T]he constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults." *In re Gault*, 387 U.S. at 55, 87 S.Ct. at 1458. To that end, Md.Rule 907b provides:

If a respondent child has filed a pleading admitting the allegations of the juvenile petition *or indicates to the court his intention not to deny those allegations*, the

court, before proceeding with an adjudicatory hearing, shall advise the child of the nature and possible consequences of his action or intended action. The court shall neither encourage [n]or discourage the child with respect to his action or intended action, but shall ascertain to its satisfaction that the child understands the nature and possible consequences of failing to deny the allegations of the juvenile petition, and that he takes that action knowingly and voluntarily. These proceedings shall take place in open court and shall be on the record....

(Emphasis added.) Despite the State's protestations to the contrary, a plain reading of Rule 907b establishes that the rule is applicable whether or not the juvenile is represented by counsel. *Compare* Md.Rule 906b (establishing that the court must conduct a similar inquiry of a respondent who elects to waive representation by counsel, even before the respondent has indicated whether he will admit or deny the allegations in the petition).

Rule 907b is the mere codification of the practice that prevailed even prior to the rule's promulgation. As this Court explained just prior to the adoption of Rule 907b in 1975:

[I]f admissions by the juvenile by answer or in open court have, in fact, the effect of a guilty plea, we believe that the affirmative acceptance by the court should be required under the constitutional guidelines applicable to a plea of guilty in a criminal case. In other words, such admissions may be effectively accepted and considered by the court only under the standard applicable to a waiver of constitutional rights....

*In re Appeal No. 544*, 25 Md.App. 26, 42–43, 332 A.2d 680 (1975) (where the accused juvenile was *not* represented by an attorney). It is beyond dispute that, regardless of whether a criminal defendant is represented by counsel, an inquiry must be conducted of him to ensure that his guilty plea is voluntary. *See generally* Md.Rule 4–242(c).

The juvenile court did not comply with Rule 907b. It accepted defense counsel's word that Montrail M. admitted

that the allegation against him was true without inquiring of Montrail M. whether he understood the nature and the possible consequences of failing to deny the allegation, and whether his admission was knowing and voluntary. The finding that Montrail M. committed the delinquent act of driving without a license, therefore, must be reversed and remanded to the juvenile court for a new hearing.

At the subsequent disposition hearing, the court considered the finding that Montrail M. had committed a delinquent act by driving without a license, as well as the findings, to be discussed *infra*, for controlled dangerous substance violations. Because that disposition was based, in part, on the improper adjudication, that disposition as well must be vacated and remanded to the juvenile court for further proceedings.

## B.

### *Controlled Dangerous Substance Violations*
### FACTS

At the second adjudicatory hearing, all three appellants, as well as a fourth juvenile who is not a party to this appeal, were found to have committed delinquent acts. That hearing was the result of an encounter that occurred between the youngsters and law enforcement officers during the early morning of May 12, 1990.

Kent County Deputy Sheriff Glen Owens testified that at approximately 2:00 A.M., he heard a report over his radio of a suspected drunk driver in a "tan or brownish" station wagon. About an hour later, an "earthtone" station wagon passed him going in the opposite direction. Deputy Owens suspected that the vehicle was the subject of the earlier radio report. He turned his car around in order to follow the station wagon but lost sight of it.

The deputy explained that shortly thereafter he drove by a private business called "Chesapeake Diesel" and something caught his attention. The building was located off the road in a secluded area and abutted a gravel lot.

Deputy Owens pulled into the lot and spotted the "earthtone" station wagon parked next to the building, about 30 to 40 feet from the road, with its lights off. Deputy Owens observed that there were three persons in the vehicle and that "[t]here was a lot of movement inside the vehicle." [2] The driver appeared to reach beneath his seat.

The deputy checked the car's license plate and ascertained that the vehicle was not the subject of the drunk driving report. Because the car was parked outside a private business in an isolated area at 3:30 in the morning, however, he remained suspicious and was concerned for his own safety. He called for back-up, knowing that the only other unit on duty at the time was a canine unit. He then got out of his car and approached the station wagon.

In the meantime, the driver of the station wagon, Matio C., had gotten out of the car and was looking under the hood. Deputy Owens explained that he spoke with Matio C. and determined that he did not appear to be under the influence of alcohol or any other substance. The conversation did nothing, however, to allay the deputy's suspicion that something was amiss.

According to Deputy Owens, Matio C. told him that the brakes on his car had locked and that "he had to use his emergency brake to stop pulling into the parking lot." Deputy Owens observed that the gravel in the lot was not "disturbed" in the way it would have been had the vehicle come to an "abrupt stop." Matio C. indicated that something was wrong with a rear tire. Deputy Owens looked at the tire and noticed nothing out of the ordinary. Matio C. then informed the deputy that he was on his way to

---

2. The record indicates that there were five persons in the car at one point. Two had gotten out of the vehicle and gone into a nearby field just before Deputy Owens arrived. The two eventually returned and were arrested with the others. The appellants indicate in their brief that they were the three persons who remained in the vehicle and were confronted by Deputy Owens. The record indicates, however, that Harold S., Jr. was one of the juveniles who left the vehicle and later returned.

Butlertown. In the deputy's view, Matio C. had chosen a roundabout route.

Deputy Owens then asked to see Matio C.'s license and registration. He told the three juveniles to remain seated in the vehicle while he "checked out the situation and all." He then ascertained that the station wagon was titled to Matio C. and his father jointly.

As Deputy Owens was running a check on Matio C.'s documents, the canine unit arrived.[3] The deputy estimated that he had then been at the scene for approximately five minutes. He testified that he requested that the dog "scan" the station wagon while the juveniles remained seated inside. Counsel for all three appellants moved to suppress any evidence regarding the scan and subsequent seizures of contraband from the car, arguing that both the initial detention of the juveniles and the canine's scan were unjustified.[4] The motions were denied, and Deputy Sheriff Ronald Bakeoven, the canine handler, then testified that the dog walked around the vehicle and indicated, by sitting, that a controlled dangerous substance was present.

Satisfied that the dog's reaction amounted to probable cause to believe there were drugs in the vehicle, Deputy Bakeoven ordered the youngsters out of the car and searched the vehicle. *See Malcolm v. State*, 314 Md. 221, 226–27, 550 A.2d 670 (1988) (because of the inherent mobility of a vehicle, a warrantless search is justified where there is probable cause to believe that the vehicle contains contraband). He testified that he found a "small white plastic packet" behind the driver's seat and a plastic bag containing suspected marijuana beneath the carpet by the car's

---

**3.** Two officers of the Chestertown Police Department arrived to assist Deputy Owens as well.

**4.** While Md.Rule 4–252 requires criminal defendants to file motions to suppress evidence prior to trial in the circuit court, there is no such requirement for juvenile proceedings.

brake.[5] Based on these discoveries, the occupants of the car were placed under arrest.[6]

Deputy Bakeoven explained that the car was taken to the Sheriff's office, where a more thorough search was conducted. In addition to the substances already seized, nine vials of suspected crack cocaine were found. Subsequent testing established that the white plastic packet and the nine vials did indeed contain cocaine.

A third deputy told the court that all three appellants, as well as the fourth juvenile who is not a party to this appeal, were informed of their rights and were questioned. All four indicated that they had driven to Philadelphia on the preceding evening and had purchased drugs. The deputy was permitted to testify to the substance of the statements, over the appellants' objections. None of the juveniles testified.

## DISCUSSION

### I.

#### *Merger*

■ The appellants argue that the juvenile court's findings that each of them possessed cocaine should have been merged, for purposes of their dispositions, into its findings that they possessed cocaine with intent to distribute. *See Hawkins v. State,* 77 Md.App. 338, 348–49, 550 A.2d 416 (1988). This argument is without merit.

■ "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions," convictions based on those two provisions will be merged in order to

---

5. Possession of marijuana charges that had been filed against the juveniles were dismissed by the State during the hearing below. No explanation is given for the dismissal.

6. As explained *supra,* at 428, n. 2, two more youngsters were arrested when they returned to the car.

prevent dual punishment.[7] *Blockburger v. United States,*
284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)
(emphasis omitted). *See also Newton v. State,* 280 Md. 260,
273–74, 373 A.2d 262 (1977). We note that there is no
indication that the juvenile court in the case before us
imposed separate dispositions for possession and possession
with intent to distribute. More significantly, the concept of
merger is inapposite to the proper application of Maryland's
Juvenile Causes Act. *See* Md.Cts. & Jud.Proc.Code Ann.
§§ 3–801—3–806.

The Juvenile Causes Act is designed, in part,

> (1) To provide for the care, protection, and wholesome
> mental and physical development of children coming with-
> in the provisions of this subtitle; and to provide for a
> program of treatment, training, and rehabilitation consist-
> ent with the child's best interests and the protection of
> the public interest;
>
> (2) To remove from children committing delinquent acts
> the taint of criminality and the consequences of criminal
> behavior....

*Id.,* § 3–802. As this Court has explained, "[t]he disposi-
tions of the juvenile court are not to be considered as
punishments for a crime nor are adjudications of delinquen-
cy 'convictions,' as that word is generally applied with
respect to criminal proceedings." *In re Appeal Misc. No.
32,* 29 Md.App. at 704, 351 A.2d 164. "[T]he proceedings of
a juvenile court are not criminal in nature and its disposi-
tions are not punishment for crime ...; ... the juvenile law
has as its underlying concept the protection of the juvenile,
so that judges, in making dispositions in juvenile cases,
think not in terms of guilt, but of the child's need for
protection or rehabilitation...." *Matter of Davis,* 17 Md.

---

**7.** As noted *supra,* at 429, two separate packets of cocaine were seized
in the case *sub judice.* The court below made no express finding as to
whether the appellants intended to distribute the contents of one or
both packets. Thus, we shall assume that the findings that the
appellants possessed cocaine and possessed cocaine with intent to
distribute arose from the same act or transaction.

App. 98, 103, 299 A.2d 856 (1973) (citations omitted). *See also* Md.Cts. & Jud.Proc.Code Ann. § 3–820(b) (providing that "[t]he priorities in making a disposition are the public safety and a program of treatment, training, and rehabilitation best suited to the physical, mental, and moral welfare of the child consistent with the public interest").

The dispositions in the case *sub judice* are simply not separate punishments for the same act. In committing the appellants to the custody of the Department of Juvenile Services, the juvenile court acted in accordance with the Juvenile Causes Act. It determined how best to meet the child's need for protection or rehabilitation and to protect the public interest by properly considering the serious nature of the delinquent acts, the family lives and academic backgrounds of the appellants, and the evaluations and recommendations of a Department of Juvenile Services Counselor.

It is not beyond the realm of imagination, however, that a juvenile court judge might disregard the letter and the spirit of the Juvenile Causes Act and impose separate "punishments" for a single act. Such action on the part of a juvenile court judge would clearly be improper. *Cf. Breed v. Jones,* 421 U.S. 519, 532–33, 95 S.Ct. 1779, 1787, 44 L.Ed.2d 346 (1975) (applying the Fifth Amendment double jeopardy prohibition, as it pertains to multiple prosecutions, to juvenile delinquency proceedings, and requiring that the decision to transfer a juvenile case to the criminal court be made before the adjudicatory hearing). *See generally In re Winship,* 397 U.S. 358, 90 S.Ct. 1068; *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428 (indicating that because his liberty interest may be at stake, a juvenile against whom a delinquency petition is filed is entitled to many of the constitutional prosecutions accorded criminal defendants. This is so despite the fact that juvenile delinquency proceedings are classified as civil in nature). That, however, is not the situation here. There is nothing in the record to indicate that the juvenile court deviated from the letter or the spirit of the Juvenile Causes Act in the case *sub judice.*

## II.

### *Motion to Suppress*

The appellants next contend that the juvenile court erred in denying their motions to suppress the contraband seized from Matio C.'s car. According to the appellants, both the detention and the canine search were unjustified.

 Whether the Fourth Amendment exclusionary rule is applicable to juvenile delinquency proceedings is an issue of first impression in this State. *Cf. In re Owen F.*, 70 Md.App. 678, 688–89, 523 A.2d 627 (1987) (in finding that a juvenile had abandoned evidence he sought to have suppressed, this Court assumed, without deciding, that the rule is applicable). The matter has not been addressed by the Supreme Court. *Compare In re Gault*, 387 U.S. at 55, 87 S.Ct. at 1458 (holding that the Fifth Amendment exclusionary rule applies to juvenile delinquency proceedings). Other states which have reached the issue have consistently held that the exclusionary rule is applicable. *See, e.g., In re William G.*, 40 Cal.3d 550, 221 Cal.Rptr. 118, 709 P.2d 1287, 1298 (1985); *Interest of L.L.*, 90 Wis.2d 585, 280 N.W.2d 343, 347 (1979); *State v. Doe*, 93 N.M. 143, 597 P.2d 1183, 1186 (1979)[8]; *In re Marsh*, 40 Ill.2d 53, 237 N.E.2d 529, 531 (1968)[9]; *State in Interest of L.B.*, 99 N.J.Super. 589, 240 A.2d 709, 713 (1968); *Cf. People in Interest of D.E.J.*, 686 P.2d 794, 796 (Colo.1984); *Matter of L.G.M.*, 704 P.2d 88, 89–90 (Okla.Crim.1985). In our view, as apparently in the views of those jurisdictions which have addressed the issue, the Fourth Amendment's "twin goals of enabling the judiciary to avoid the taint of partnership in official lawlessness and of assuring the people . . . that the government would

---

**8.** In New Mexico, the limitations on searches and seizures based on the Fourth Amendment are specifically guaranteed to juveniles under the Children's Code. *See* N.M.Stat.Ann. § 32–1–27 (1978).

**9.** Explicitly holding "that the exclusionary rules required by the Fourth Amendment's prohibition against illegal search and seizures are applicable to proceedings under the Juvenile Court Act." 237 N.E.2d at 531.

not profit from its lawless behavior" are as pertinent to juvenile delinquency proceedings as they are to criminal proceedings. 1 LaFave, Search and Seizure § 1.7(b) (1987) at 150 (quoting *United States v. Calandra*, 414 U.S. 338, 357, 94 S.Ct. 613, 624, 38 L.Ed.2d 561 (1974) (dissenting opinion)).

■■■■ With that in mind, we hold that the exclusionary rule is applicable to juvenile delinquency proceedings in Maryland. We need not reach this argument as to Montrail M. and Harold S., Jr. Neither has made any attempt to establish a privacy interest in Matio C.'s car.[10] As mere passengers, they had no reasonable expectation of privacy. *See Rakas v. Illinois*, 439 U.S. 128, 148–49, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978); *Gahan v. State*, 290 Md. 310, 313–19, 430 A.2d 49 (1981). As to Matio C., we find that the argument is without merit. *See generally Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990) (explaining that an appellate court makes its own constitutional appraisal when reviewing a motion to suppress).

■■■■ It is clear that the deputy "seized" the appellants, within the meaning of the Fourth Amendment, when he instructed them to remain in the car while he "checked out the situation and all." We are not persuaded, however, by the appellants' argument that the seizure was improper. The record below establishes that the deputy's actions were justified.

■■■■ Deputy Owens had spotted a car occupied by three juveniles at approximately 3:00 in the morning. The car was stopped on the parking lot of a private business in a secluded area. When Deputy Owens questioned Matio C.,

---

10. Counsel for all three appellants argued unsuccessfully below that the evidence should be suppressed. The State never pointed out that neither Montrail M. nor Harold S., Jr. had a reasonable expectation of privacy in the car, although counsel for Harold S., Jr. admitted as much in his argument. This Court may address the issue even though it was not decided by the lower court. *See, e.g., Graham v. State*, 47 Md.App. 287, 290–91, 421 A.2d 1385, cert. denied, 290 Md. 715 (1981).

the boy's answers were inconsistent with the deputy's own observations. There was no visible evidence that the car's brakes had failed or that there was trouble with a tire. It seemed unlikely to the deputy that the juveniles were truly heading for their proclaimed destination. Under these circumstances, we agree with the juvenile court that Deputy Owens had a reasonable, articulable suspicion to justify the detention. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *Derricott v. State*, 84 Md.App. 192, 208, 217, 578 A.2d 791 (1990), *cert. granted*, 321 Md. 633, 584 A.2d 64 (1991).

The juvenile court pointed out several times that Deputy Owens did not have a reasonable belief that Matio C.'s car contained drugs. A review of the record convinces us that the court's observation was correct. Nevertheless, the juvenile court found that the canine search of the vehicle was proper, and so shall we. In *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983), the Supreme Court found that where law enforcement officers at an airport suspected that a person was carrying narcotics in his luggage, "exposure of [the] luggage, which was in a public place, to a trained canine[,] *did not constitute a search within the meaning of the Fourth Amendment.*" (Emphasis added). *See* Whitebread, Criminal Procedure § 4.02 (2d ed. 1986) at 121, n. 6 (pointing out that "[a]rguably, the Court's discussion of the canine sniff was dicta....."). *Accord United States v. Vasquez*, 909 F.2d 235, 238 (7th Cir.1990) (canine sniff for purpose of detecting contraband in free-standing garage held not to be a search); *United States v. Colyer*, 878 F.2d 469, 473–74 (D.C.Cir.1989) (canine scan of sleeping compartment in train held not to constitute a search). *But see United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir.1985), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985) (dog sniff conducted outside door of apartment found to be a search).

The United States Court of Appeals for the Fifth Circuit relied on *Place* in upholding a search and seizure at a

border checkpoint. *See United States v. Dovali–Avila,* 895 F.2d 206 (5th Cir.1990). In *Dovali–Avila,* a routine canine scan was conducted of the appellant's vehicle when it arrived at the checkpoint. The court held that the canine scan itself was not a search, and that the dog's reaction amounted to probable cause to search the vehicle. *Id.* at 207–08.

Similarly, the Court of Appeals for the Tenth Circuit has held that law enforcement agents do not need an individualized suspicion of drug-related criminal activity before subjecting a vehicle lawfully detained at a roadblock to a canine scan. *United States v. Morales–Zamora,* 914 F.2d 200, 203–05 (10th Cir.1990). The roadblock in *Morales–Zamora* was set up to ensure that all motorists had drivers licenses, vehicle registration cards, and proof of insurance, and the scan was conducted contemporaneously with the interrogation of the driver.

As *Place, Dovali–Avila,* and *Morales– Zamora* establish, a canine scan of personalty such as luggage or a vehicle, conducted pursuant to a valid detention, is a minimally intrusive investigative procedure. Neither the dog nor any law enforcement officer opens or enters the personalty. One's home or bodily integrity is not violated. The lawful detention need not be prolonged to accommodate a canine scan—hence, the scan need not add any inconvenience to the detention. Unless the factual scenario includes some additional element, a canine scan conducted contemporaneously with a detention that passes Fourth Amendment muster does not further implicate the Fourth Amendment.

Such an additional element was included in the factual scenario of *Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990), where this Court held that a reasonable articulable suspicion that drugs were present was required to justify the detention of a driver and vehicle so that a canine scan could be conducted. *Id.* at 267, 578 A.2d 816. Our holding in that case is thus inapplicable to the case before us. In *Snow,* a police officer, who had a trained dog in his police car, stopped a vehicle in order to issue the driver a speeding

ticket. After the ticket was written, the officer continued the detention in order to remove the dog from his cruiser and conduct a scan. We noted that the officer had actually engaged in two separate detentions—one to issue the ticket and the other to conduct the scan. Because the officer had no reasonable articulable suspicion as to drug-related activity, we found that the second detention was unjustified. *Compare United States v. Hardy*, 855 F.2d 753, 758–61 (11th Cir.1988), *cert. denied*, 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989) (a police officer who stopped a motorist to issue a speeding ticket, then developed a reasonable articulable suspicion that the vehicle contained contraband, properly detained the vehicle and its occupants for 50 minutes until a drug-sniffing dog was brought to the scene).

Only one detention occurred in the case *sub judice.* The trained dog arrived on the scene while Deputy Owens was still running a check on Matio C.'s license and registration, and the scan took place as the deputy completed the check. In short, the initial detention of the appellants was based on a reasonable articulable suspicion, and no additional Fourth Amendment rights were implicated by the canine scan of Matio C.'s station wagon. The dog's reaction properly served as probable cause to search the vehicle.

### III.

#### *Bruton Problem*

■ Over the appellants' objections, the juvenile court permitted the deputy sheriff who took statements from the juveniles involved in the incident to testify regarding those statements. The appellants now contend that the admission of the testimony violated the *Bruton* rule. ln *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that where two defendants are tried together, a confession by one defendant that implicates the other cannot be admitted into evidence unless the confessing defendant takes the stand and is available to be cross-examined by the other defendant. This court has

held that the *Bruton* rule is applicable to juvenile delinquency proceedings. *See In re Appeal No. 977,* 22 Md.App. 511, 516, 323 A.2d 663 (1974).

A review of the record establishes that the State's attorney attempted to prevent any *Bruton* problem by asking the deputy to reveal only those portions of each juvenile's statement that implicated that particular juvenile. This attempt was unsuccessful. The deputy testified to the effect that each youngster told him that he and the others had gone to Philadelphia on the previous evening and had purchased drugs. It is thus clear that the *Bruton* rule was violated. *Cf. Cruz v. New York,* 481 U.S. 186, 193–94, 107 S.Ct. 1714, 1719–20, 95 L.Ed.2d 162 (1987) (holding that the *Bruton* rule applies even where the defendant's own confession interlocks with a codefendant's confession).

We find, however, that the violation does not rise to the level of reversible error. While the statements complained of contained somewhat varying degrees of detail, they were substantially identical. None was more inculpatory than another. We are confident that, under the circumstances, there was "no reasonable possibility that the evidence complained of ... contributed to the rendition" of the delinquency findings. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976). *See generally Cruz,* 481 U.S. at 194, 107 S.Ct. at 1719–20. *See, e.g., Earhart v. State,* 48 Md.App. 695, 707–12, 429 A.2d 557 (1981).

JUDGMENT AS TO MONTRAIL M. FOR DRIVING WITHOUT A LICENSE REVERSED AND REMANDED; JUDGMENT AS TO MONTRAIL M. FOR POSSESSION OF COCAINE AND POSSESSION OF COCAINE WITH INTENT TO DISTRIBUTE AFFIRMED; DISPOSITION AS TO MONTRAIL M. VACATED.

JUDGMENTS AS TO HAROLD S., JR. AND MATIO C. AFFIRMED.

ONE–HALF OF COSTS TO BE PAID BY APPELLANTS AND ONE–HALF BY KENT COUNTY.